# IN THE UNITED STATES DISTRICT COURT
## FOR THE MIDDLE DISTRICT OF TENNESSEE
### NASHVILLE DIVISION

**Thomas Griffin p/k/a**
**"Thomas Leon"**

      **Plaintiff,**
                                 **Case No._____**

**v.**                                           **Jury Trial Demanded.**

**Sydni Stephens and**
**Andrew Wilkerson Jr.**
**p/k/a "AJ Wilkerson",**

      **Defendants.**

---

## VERIFIED COMPLAINT

---

Comes now the Plaintiff, Thomas Griffin by and through his undersigned counsel, and for his Verified Complaint against Defendants, Sydni Stephens and Andrew Wilkerson Jr. p/k/a "AJ Wilkerson", hereby states as follows:

### INTRODUCTION

1.    Plaintiff, a professional comedian and podcast creator, brings this action to address Defendants' calculated and malicious campaign to defame him, interfere with his business relationships, and exploit his intellectual property without authorization. Over the course of their brief professional collaboration, Defendants leveraged false allegations to sabotage Plaintiff's career, falsely portraying him as a sexual predator to colleagues and the public. These actions have caused Plaintiff severe financial and reputational harm, while Defendants have unlawfully profited

from the intellectual property Plaintiff contributed to their joint project. This lawsuit seeks to halt Defendants' ongoing misconduct, recover damages, and restore Plaintiff's professional standing.

## PARTIES

2.      Plaintiff Thomas Griffin p/k/a "Thomas Leon" ("Plaintiff" or "Griffin") is an adult resident citizen of Texas.

3.      Upon information and belief, Defendant Sydni Stephens ("Stephens") is an adult resident citizen of Davidson County, Tennessee.

4.      Upon information and belief, Andrew Wilkerson Jr. p/k/a "AJ Wilkerson" ("Wilkerson") is an adult resident citizen of Davidson County, Tennessee.

5.      Stephens and Wilkerson are sometimes referred to herein collectively as "Defendants".

## JURISDICTION AND VENUE

6.      This Court has subject matter jurisdiction over this lawsuit pursuant to 28 U.S.C. § 1332, because Plaintiff and Defendants are citizens of different states and the amount in controversy exceeds $75,000.00, exclusive of interests and costs.

7.      This Court has specific personal jurisdiction over Defendants based upon their own respective certain acts or omissions conducted in, and minimum contacts, with the State of Tennessee, as more fully described herein. This Court also has general personal jurisdiction over Defendants because they reside in this judicial district.

8.      Venue in this district is proper pursuant to 28 U.S.C. § 1391(b)(2) because a substantial part of the events giving rise to Plaintiff's Verified Complaint occurred in this judicial district.

## FACTUAL ALLEGATIONS

9.      Plaintiff is a standup comedian, entrepreneur, and podcaster who resides in Austin, Texas.

10.     Wilkerson is a Nashville based standup comedian and podcaster.

11.     Wilkerson employed Plaintiff as a videographer and opening act beginning in August 2023.

12.     Stephens is also a stand-up comedian and podcaster who moved from Minnesota to Nashville in late 2023 to pursue comedy and live with Wilkerson.

13.     Upon information and belief, in November of 2023, Plaintiff, Wilkerson, and Stephens, started a podcast venture entitled, *What in Tardation* (the "WIT Podcast") in which they were partners in a general partnership. They primarily used Plaintiff's podcast equipment.

14.     Beginning in February 2024, Wilkerson began taking Plaintiff and Stephens on the road with him to perform standup comedy in various cities across the country as opening acts.

15.     It was common for Wilkerson to only book one hotel room for Plaintiff and Stephens which they were required to share.[1]

16.     They also often recorded WIT Podcast episodes on these trips.

17.     Beginning in April 2024, Plaintiff and Stephens briefly engaged in consensual sexual activity on multiple occasions, when they were on the road with Wilkerson. They were not in an exclusive relationship.

18.     When Plaintiff and Stephens returned to Nashville on April 28, 2024, Stephens expressed that she had romantic feelings for Plaintiff.

19.     However, Plaintiff expressed to Stephens that he did not want to have an exclusive relationship with her.

20.     Then Plaintiff and Stephens had a long talk (*initiated by Plaintiff*) about how they should not "hookup" anymore because of the pressure on their work relationship (*i.e.* the WIT Podcast and standup touring with Wilkerson).

---

[1] Wilkerson referred to it on at least one occasion as the "honeymoon suite."

3

21.     Plaintiff candidly lamented to Stephens that he oftentimes felt that it was difficult for him to turn down sexual experiences *when he was approached by women who were seeking to have them with him*.

22.     Stephens did not appear to be upset by this and was aware that this was something Plaintiff often joked about during his standup set.[2]

23.     Outside of their respective standup sets, Stephens consistently engaged Plaintiff with sexually charged flirtation and inuendo. *See e.g.* Exhibit A.

24.     On May 3, 2024, following a gig in Seattle, Washington, Plaintiff engaged in consensual sexual activity with another female who attended their show (hereinafter "Witness A").

25.     As discussed below, Stephens later became aware of Plaintiff's sexual relationship with Witness A and by her own admission became "triggered".

26.     Unbeknownst to him, the wireless microphone Plaintiff was wearing picked up much of his initial interaction with Witness.

27.     Upon information and belief, the microphone saved the conversation to its internal hard drive.

28.     Upon information and belief, Stephens then transferred the wireless microphone data to Wilkerson's laptop computer.

29.     On May 11, 2024, Plaintiff and Stephens were sharing a hotel room at the Fontainebleau in Las Vegas, Nevada ahead of a gig at the Wiseguys Comedy Club with Wilkerson.

30.     At or around noon, Plaintiff was laying in his bed minding his own business, when *Stephens climbed in Plaintiff's bed* and started massaging his feet. This was out of the blue, and it was completely initiated by Stephens.

---

[2] Stephens's standup set also largely featured very raunchy sexual humor.

31.     Regrettably, Plaintiff did not stop Stephens.  Stephens then began massaging Plaintiff's bare chest.

32.     When Plaintiff reacted and indicated that he was open to what he could only logically interpret (based on their prior history) as a sexual advance by Stephens, she responded simply by saying: "*it can't be sexual*" and "*we said we wouldn't*". Stephens then returned to her own bed, and that was the end of it.

33.     For the avoidance of doubt, in no way did Plaintiff pursue further physical contact with Stephens. In no way did Stephens indicate that anything was wrong, that she was upset with Plaintiff, and/or that she had any feeling toward him other than "love" and affection.

34.     By way of example, during the WIT Podcast episode Stephens recorded with Wilkerson and Plaintiff the next day, Stephens was extremely flirty and playful with Plaintiff, to the point of spontaneously telling Plaintiff that she loved him. *See generally*, **<u>Manually Filed Exhibit B</u>**, *Video Clip from WIT Podcast Episode Recorded May 12, 2024.*[3]

35.     Stephens continued to flirt and make advances toward Plaintiff after the Vegas trip.

36.     By way of example, on May 18, 2024, at a party in Nashville, Tennessee, Stephens approached Plaintiff and repeatedly, inappropriately, touched Plaintiff's posterior, groping him without his consent, while she told him that she missed him.

37.     However, upon information and belief, the next day on May 19, 2024, Stephens listened to the audio footage from the May 3, 2024 show in Seattle that she had put on Wilkerson's computer.

---

[3] Pursuant to Administrative Order 205, In Re: Guidelines for Filing Audio or Video Files, a physical copy of the audio-video footage from the *WIT Podcast Episode* recorded May 12, 2024, in (avi.) format will be submitted on a flash drive to the Clerk's Office contemporaneously herewith, as **<u>Exhibit B</u>**.

38.     Upon information and belief, contained therein was a surreptitiously recorded private conversation between Plaintiff and Witness A which was captured by the wireless microphone Plaintiff had been assigned to wear.

39.     Upon information and belief, the surreptitiously recorded conversation between Plaintiff and Witness A, removed all doubt in Stephens mind that Plaintiff would never be in an exclusive relationship with her.

40.     Stephens became extremely upset and wanted Plaintiff kicked off Wilkerson's tour.

41.     Stephens confronted Plaintiff on the phone and over text about Witness A. Stephens explained that it was "triggering" for her to hear Plaintiff with Witness A.

42.     Stephens then falsely accused Plaintiff of sexually assaulting Witness A.

43.     For the avoidance of doubt, the idea that Plaintiff's encounter with Witness A was anything other than consensual is absurd.[4]

44.     Upon information and belief, Stephens made statements falsely accusing Plaintiff of sexually assaulting Witness A and published them orally and in writing to third parties including but not limited to Wilkerson and his girlfriend.

45.     Plaintiff attempted to check on Stephens by text message on May 28, 2024. Stephens responded: "Sorry, I've been slammed. We fly out at 6. I've been going through some stuff. *Honestly I don't like/appreciate the way you treated me when we were alone in the hotel room in Vegas and I would like a little bit of space*."

46.     Plaintiff was stunned because this was the first time that he had heard anything of the sort from Stephens or anyone else. Plaintiff tried to give Stephens space but he was justifiably alarmed that he was being lied about.

---

[4] Plaintiff received a text message from Witness A on May 4, 2024, stating in pertinent part: "…*I had a really nice time getting to know you a bit and rolling around at my place was fun*." <u>Exhibit C</u>.

47.     In an attempt to repair his personal and professional relationship with Stephens, Plaintiff met her in person for a walk on June 10, 2024, in Nashville, Tennessee to clear the air. There Stephens admitted Plaintiff's relationship with Witness A was consensual (it was). *See also,* <u>Exhibit C</u>, *text messages between Plaintiff and Witness A*.

48.     On June 14, 2024, Plaintiff spoke with Wilkerson by phone and text. Among other things, Wilkerson repeated the absurd lie that Plaintiff had sexually assaulted Witness A. *See* <u>Collective Exhibit D</u>, *text messages between Plaintiff and Wilkerson*.

49.     Additionally, Wilkerson falsely accused Plaintiff of "sexually assaulting" Stephens and informed him that he was ostensibly terminating their business relationship because of Stephens's allegations.

50.     For the avoidance of doubt, Plaintiff did not sexually assault Stephens. Plaintiff did not rape Stephens.

51.     Wilkerson refused to investigate the veracity of Stephens's claims and admitted that he did not seek Plaintiff's version of events.[5]



---

[5] *See Collective* Exhibit D, *text messages between Plaintiff and Wilkerson*.

52.     However, Wilkerson threatened to escalate this situation by either making these false accusations public (through his substantial online following) or reporting them to law enforcement, should Plaintiff dare to continue to refute them.[6] *See Id*.



53.     On July 7, 2024, Wilkerson published the false statement "THOMAS THE RAPIST", in writing, to the staff and of the prominent Nashville comedy club, Zanies, with the assurance that "everybody knows", in clear reference to Plaintiff. *See Id*.

---

[6] *See Collective* Exhibit D, *text messages between Plaintiff and Wilkerson*.



54.     The statement is untrue. Wilkerson knew it to be untrue. By Wilkerson's own admission, the statement was made without any proper investigation into its truth or falsity.

55.     Upon information and belief, Stephens has a history of making false allegations.

56.     Upon information and belief, Defendants used these false allegations as a pretext to wrongfully seize the WIT Podcast for themselves, ostensibly throwing him out of the business and retaining it for their own commercial purposes.

57.     Nonetheless, Defendants continued to unlawfully exploit Plaintiff's name, image, and likeness ("NIL") in the WIT Podcast on their social media platforms, websites, and other promotional materials without his consent.[7]

---

[7] *See e.g. What in Tardation Podcast*, EP 14 available at:
https://www.youtube.com/watch?v=9w45ZbVFnMI&list=PLw8chV1eVv8gjgedYiFiWubz18e68Saj&index=26 (last accessed December 14, 2024.)

58.     Plaintiff did not grant Defendants the unrestricted right to use his intellectual property for whatever commercial purpose, in perpetuity.

59.     Prior to commencing this action, Plaintiff provided Defendants an opportunity to correct, clarify, and/or retract their defamatory statements, as well as cease the use of his protected intellectual property, to no avail. It is now clear that Defendants will not do so without judicial intervention.

60.     Accordingly, Plaintiff was forced to bring the instant action to stop Defendants' willful campaign of defamation and ongoing infringement of his protected intellectual property rights that continue to this day.

61.     As a direct and proximate result of Defendants' tortious conduct, Plaintiff has suffered money damages in an amount not less than two hundred fifty thousand dollars ($250,000) including but not limited to the loss of income and benefits, loss of future economic benefits and earning capacity, as well as reputational damages and severe emotional distress.

62.     Plaintiff reserves the right to amend this Verified Complaint as additional facts are uncovered in the discovery process.

## CAUSES OF ACTION

### COUNT I
### DEFAMATION: LIBEL/SLANDER
**(All Defendants)**

63.     Plaintiff incorporates and restates each of the above paragraphs as if fully stated herein.

64.     As discussed herein, the unprivileged statements (written and oral) made by Defendants to others about Plaintiff were false, substantially untrue, and materially false. *Sullivan v. Baptist Mem'l Hosp.*, 995 S.W.2d 569, 571 (Tenn. 1999).

10

65.     At the time such statements were made by Defendants, Defendants knew or should have known that they were false and defamatory.

66.     As discussed above, Defendants published the statements to third parties.

67.     When Defendants made the defamatory statements, they knew that they were false or acted with willful and intentional disregard of the truth or falsity of the statements. *West v. Media Gen. Convergence, Inc.*, 53 S.W.3d 640, 647 (Tenn. 2001).

68.     Defendants had no applicable privilege or legal authorization to publish the defamatory statements. The defamatory statements were a substantial factor in causing Plaintiff to suffer economic and non-economic loss, in an amount to be proven at trial. *Revis v. McClean*, 31 S.W.3d 250, 252-53 (Tenn. Ct. App. 2000); *McGuffey v. Belmont Weekday Sch.*, No. M2019- 01413-COA-R3-CV, 2020 Tenn. App. LEXIS 242, at *48 (Tenn. Ct. App. May 27, 2020).

69.     Accordingly, Plaintiff demands judgment against Defendants for defamation (libel and/or slander) in an amount to be determined at trial, together with all accruing interest and costs, including without limitation, attorneys' fees and all expenses incurred by Plaintiff, and punitive damages.

## COUNT II
## <u>INTENTIONAL INFLICTION OF EMOTIONAL DISTRESS</u>
### (All Defendants)

70.     Plaintiff incorporates and restates each of the above paragraphs as if fully stated herein.

71.     Defendants' conduct as described above was intentional and/or reckless. Defendants acted with the purpose of causing Plaintiff severe emotional distress or with reckless disregard for the likelihood such distress would result.

72.     Defendants intentional conduct was so outrageous so as not to be tolerated in a civilized society.

73.     As a direct and proximate result of Defendants' conduct, Plaintiff has suffered damages, including without limitation, severe emotional distress.

74.     The actions of Defendants were wanton, reckless, willful, and outrageous.

75.     Accordingly, Plaintiff demands judgment against Defendants for Intentional Infliction of Emotional Distress in an amount to be determined at trial, together with all accruing interest and costs, including without limitation, attorneys' fees and all expenses incurred by Plaintiff, and punitive damages.

**COUNT III**
**<u>TORTIOUS INTERFERENCE WITH BUSINESS RELATIONS DISTRESS</u>**
**(Stephens)**

76.     Plaintiff incorporates and restates each of the above paragraphs as if fully stated herein.

77.     In order to recover for tortious interference with business relationships in Tennessee, a plaintiff must prove:

> (1) an existing business relationship with specific third parties or a prospective relationship with an identifiable class of third persons; (2) the defendant was aware of the relationship; (3) the defendant intended to induce a breach or terminate the relationship; (4) the defendant's improper motive or improper means; and (5) damages resulting from the tortious interference.

*Trau-Med of Amer., Inc. v. Allstate Ins. Co.*, 71 S.W.3d 691, 701 (Tenn. 2002).

78.     Plaintiff had existing and/or prospective business relationships with Wilkerson, Third Coast Comedy, the Backyard Comedy Club, and/or Zanies, that conferred a reasonable expectation of economic benefit or advantage to Plaintiff.

79.     Stephens had knowledge of Plaintiff's existing or prospective business relationships with Wilkerson, Third Coast Comedy, the Backyard Comedy Club, and/or Zanies.

80.     As described herein, Stephens intentionally and improperly interfered with Plaintiff's business relationships by inducing third parties to terminate or disrupt their business relationships

12

with Plaintiff and by making false and malicious statements about Plaintiff, and/or engaging in unfair competition.

81.     Stephens's interference was accomplished through improper means including, but not limited to fraud, misrepresentation, defamation, coercion, and/or other unlawful conduct as described herein.

82.     Stephens's interference was malicious, unjustified, and lacked privilege or lawful excuse.

83.     As a direct and proximate result of Stephens's intentional and improper interference, Plaintiff has suffered actual damages, including but not limited to: loss of business opportunities, lost revenue, damage to Plaintiff's reputation, and/or other economic and non-economic harm to be proven at trial.

84.     Stephens's actions were willful and wanton, entitling Plaintiff to punitive damages in addition to compensatory damages.

85.     Accordingly, Plaintiff demands judgment against Stephens for Intentional Interference with Business Relations in an amount to be determined at trial, together with all accruing interest and costs, including without limitation, attorneys' fees and all expenses incurred by Plaintiff, and punitive damages.

## COUNT IV
## TORTIOUS INTERFERENCE WITH BUSINESS RELATIONS DISTRESS
### (Wilkerson)

86.     Plaintiff incorporates and restates each of the above paragraphs as if fully stated herein.

87.     Plaintiff had existing and/or prospective business relationships with third parties in the comedy industry including but not limited to Zanies, that conferred a reasonable expectation of economic benefit or advantage to Plaintiff.

88.     Wilkerson had knowledge of Plaintiff's existing or prospective business relationships with these third parties including but not limited to Zanies.

89.     As described herein, Wilkerson intentionally and improperly interfered with Plaintiff's business relationships by inducing third parties to terminate or disrupt their business relationships with Plaintiff and by making false and malicious statements about Plaintiff, and/or engaging in unfair competition.

90.     Wilkerson's interference was accomplished through improper means including, but not limited to fraud, misrepresentation, defamation, coercion, and/or other unlawful conduct as described herein.

91.     Wilkerson's interference was malicious, unjustified, and lacked privilege or lawful excuse.

92.     As a direct and proximate result of Wilkerson's intentional and improper interference, Plaintiff has suffered actual damages, including but not limited to: loss of business opportunities, lost revenue, damage to Plaintiff's reputation, and/or other economic and non-economic harm to be proven at trial.

93.     Wilkerson's actions were willful and wanton, entitling Plaintiff to punitive damages in addition to compensatory damages.

94.     Accordingly, Plaintiff demands judgment against for Intentional Interference with Business Relations in an amount to be determined at trial, together with all accruing interest and costs, including without limitation, attorneys' fees and all expenses incurred by Plaintiff, and punitive damages.

95.     Wilkerson's actions were willful and wanton, entitling Plaintiff to punitive damages in addition to compensatory damages.

14

96.    Accordingly, Plaintiff demands judgment against Wilkerson for Intentional Interference with Business Relations in an amount to be determined at trial, together with all accruing interest and costs, including without limitation, attorneys' fees and all expenses incurred by Plaintiff, and punitive damages.

## COUNT V
## UNJUST ENRICHMENT
(All Defendants)

97.    Plaintiff hereby incorporates by reference the allegations in the foregoing Paragraphs as if fully set forth herein.

98.    Plaintiff provided valuable services and/or material benefits to Defendants through his performance in and through Defendants' later use of Plaintiff's Intellectual Property in the WIT Podcast as well as on Defendants' website, social media, marketing materials and/or other derivative works Defendants later created from the WIT Podcast footage. Plaintiff also provided Defendants with the use of his podcast equipment.

99.    Defendants appreciated, or reasonably should have appreciated that Plaintiff provided valuable services and/or material benefits to Defendants.

100.    Defendants knowingly accepted Plaintiff's valuable services and/or material benefits without providing him adequate compensation.

101.    Plaintiff did not confer the benefits gratuitously and reasonably expected compensation or restitution for the benefits provided.

102.    It would be unjust for Defendants to retain the benefits of Plaintiff's valuable services and/or material benefits without providing Plaintiff adequate compensation.

103.    As a direct and proximate result of Defendants' wrongful conduct and retention of the benefits, Plaintiff has suffered damages including but not limited to monetary loss.

104.    Accordingly, Defendants have been enriched at the expense of Plaintiff, and Plaintiff demands judgment for unjust enrichment in an amount to be determined at trial, together with all accruing interest and cost, including without limitation, attorneys' fees and all expenses incurred by Plaintiff.

**COUNT VI**
**VIOLATION OF RIGHT OF PUBLICITY**
**Tenn. Code Ann. § 47-25-1101 et seq.**
**Tennessee Personal Rights Protection Act**
**(All Defendants)**

105.    Plaintiff hereby incorporates by reference the allegations in the foregoing Paragraphs as if fully set forth herein.

106.    Tenn. Code. Ann § 47-25-1105 states in pertinent part:

> [a]ny person who knowingly uses or infringes upon the use of another individual's name, photograph, or likeness in any medium, in any manner directed to any person other than such individual, as an item of commerce for purposes of advertising products, merchandise, goods, or services, or for purposes of ... purchases of products, merchandise, goods, or services, without such individual's prior consent, ... shall be liable to a civil action.

Tenn. Code. Ann § 47-25-1105.

107.    The facts set forth herein establish that Defendants have used or infringed Plaintiffs' Rights of Publicity without his consent and *continue* to do so knowingly.

108.    Defendants' conduct included without limitation, the use of Plaintiff's name, likeness, and voice as items of commerce for purposes of advertising and/or soliciting goods and services without Plaintiff's consent in violation of Tenn. Code. Ann § 47-25-1105.

109.    Defendants have profited by their knowing violation of Plaintiffs' Rights of Publicity.

110.    Defendants' unauthorized use of Plaintiffs' Intellectual Property was directly connected to Defendants' commercial purpose.

111.    Defendants' actions in violation of Plaintiff's Rights of Publicity have directly and proximately caused Plaintiff to suffer financial harm in an amount to be determined at trial.

112.    Defendants' actions in violation of Plaintiff's Rights of Publicity have also caused Plaintiff to suffer irreparable and ongoing harm, for which Plaintiff have no adequate remedy at law.

113.    Accordingly, Plaintiff demand judgment against Defendants for violation of Tenn. Code Ann. § 47-25-1101 *et seq*. in an amount to be determined at trial. Further, under Tenn. Code Ann. § 47-25-1106 Plaintiffs are entitled to recover treble damages.

## COUNT VII
## COMMON LAW AND STATUTORY TORTIOUS INTERFERENCE WITH CONTRACTUAL RELATIONS
### (Stephens)

114.    Plaintiff hereby incorporates by reference the allegations in the foregoing Paragraphs as if fully set forth herein.

115.    Tenn. Code. Ann. § 47-50-109 provides:

> It is unlawful for any person, by inducement, persuasion, misrepresentation, or other means, to induce or procure the breach or violation, refusal or failure to perform any lawful contract by any party thereto; and, in every case where a breach or violation of such contract is so procured, the person so procuring or inducing the same shall be liable in treble the amount of damages resulting from or incident to the breach of the contract. The party injured by such breach may bring suit for the breach and for such damages.

Tenn. Code. Ann. § 47-50-109.

116.    Stephens knew of Plaintiff's contractual and business relationships with Wilkerson, Third Coast Comedy, the Backyard Comedy Club, and/or Zanies.

117.    Stephens intentionally interfered with and induced the termination of these existing relationships by publishing false, misleading, and/or defamatory statements to them. *Trau-Med of Am., Inc. v. Allstate Ins. Co.*, 71 S.W.3d 691, 701 (Tenn. 2002).

17

118.    Stephens intentionally, maliciously, and without justification, induced Wilkerson, Third Coast Comedy, the Backyard Comedy Club, and/or Zanies to breach their contractual agreements with Plaintiff, cease doing all business with Plaintiff by misrepresentation and/or persuasion, in a deliberate effort to harm Plaintiff in violation of Tenn. Code. Ann. § 47-50-109.

119.    Had it not been for Stephens's interference, Plaintiff would have continuing employment, equity, and business relationships with Wilkerson, Third Coast Comedy, the Backyard Comedy Club, and/or Zanies.

120.    As a direct and proximate result of Stephens wrongful actions Plaintiff suffered and continues to suffer significant damages.

121.    Accordingly, Plaintiff demands judgment against Stephens for common law and statutory tortious interference in an amount to be determined at trial with treble damages together with all interest, costs, and expenses allowed by law and incurred by Plaintiff, including without limitation, attorney fees.

## COUNT VIII
## COMMON LAW AND STATUTORY TORTIOUS INTERFERENCE WITH CONTRACTUAL RELATIONS
### (Wilkerson)

122.    Plaintiff hereby incorporates by reference the allegations in the foregoing Paragraphs as if fully set forth herein.

123.    Wilkerson knew of Plaintiff's contractual and business relationships with third parties in the comedy industry including but not limited to Zanies.

124.    Wilkerson intentionally interfered with and induced the termination of these existing relationships by publishing false, misleading, and/or defamatory statements to them. *Trau-Med of Am., Inc. v. Allstate Ins. Co.*, 71 S.W.3d 691, 701 (Tenn. 2002).

18

125.    Wilkerson intentionally, maliciously, and without justification, induced these third parties including but not limited to Zanies to breach their contractual agreements with Plaintiff, cease doing all business with Plaintiff by misrepresentation and/or persuasion, in a deliberate effort to harm Plaintiff in violation of Tenn. Code. Ann. § 47-50-109.

126.    Had it not been for Wilkerson's interference, Plaintiff would have continuing employment, equity, and business relationships with these third parties including but not limited to Zanies.

127.    As a direct and proximate result of Wilkerson's wrongful actions Plaintiff suffered and continues to suffer significant damages.

128.    Accordingly, Plaintiff demands judgment against Wilkerson for common law and statutory tortious interference with contract in an amount to be determined at trial with treble damages together with all interest, costs, and expenses allowed by law and incurred by Plaintiff, including without limitation, attorney fees.

## COUNT IX
## FALSE LIGHT
### (All Defendants)

129.    Plaintiff hereby incorporates by reference the allegations in the foregoing Paragraphs as if fully set forth herein.

130.    Defendants engaged in conduct that publicized information or statements concerning Plaintiff.

131.    The information or statements publicized by Defendants were false or misleading and created a false impression of Plaintiff.

132.    The false light in which Plaintiff was placed would be highly offensive to a reasonable person.

19

133.    Defendants acted with actual malice, meaning Defendants either knew the information or statements were false or acted with reckless disregard for the truth of the information or statements.

134.    Defendants' actions were intentional, willful, and malicious, or alternatively, were committed with reckless disregard for Plaintiff's rights.

135.    As a direct and proximate result of Defendants' actions, Plaintiff has suffered severe emotional distress, mental anguish, embarrassment, humiliation, damage to reputation, and other injuries to be proven at trial.

136.    Defendants' conduct was so egregious and offensive that it entitles Plaintiff to an award of punitive damages in addition to compensatory damages.

137.    Accordingly, Plaintiff demands judgment for False Light in an amount to be determined at trial, together with all accruing interest and cost, including without limitation, attorneys' fees and all expenses incurred by Plaintiff.

## PRAYER FOR RELIEF

**WHEREFORE**, Plaintiff respectfully prays that the Court grant him relief against Defendants as follows:

A.    Judgment for compensatory, special, punitive, and/or treble damages in appropriate amounts to be established at trial;

B.    Injunctive relief prohibiting the publication or republication of the defamatory statements and the unauthorized use of Plaintiff's NIL;

C.    An award of costs associated with this action, including pre- and post-judgment interest and reasonable attorneys' fees;

D.    And for such other and further relief as the Court deems just and equitable.

## **DEMAND FOR JURY TRIAL**

Plaintiff hereby demands a trial by jury.

This 16th day of December 2024.

Respectfully Submitted By:

/s/ Jonathan Wolf
Jonathan M. Wolf #35445

Jonathan M. Wolf, PLLC
1515 Demonbreun St., Suite 1408
Nashville, TN 37203
jonathan@wolf.lawyer
615-422-5545

*Counsel for Plaintiff Thomas Griffin*

21

## <u>VERIFICATION</u>

I, Thomas Griffin, am the Plaintiff in the action herein and do hereby swear under penalty of perjury that the foregoing Verified Complaint, and the facts contained herein, are true and correct to the best of my knowledge and belief.

_Thomas Griffin_

_____
THOMAS GRIFFIN

Document Ref: UBHNP-VV3HM-5YMCE-E8KXZ